**Richard VIETH, Norma Jean Vieth, and Susan Furey, Plaintiffs**

**v.**

**COMMONWEALTH OF PENNSYLVANIA, et al., Defendants**

**No. 1:CV–01–2439.**

United States District Court, M.D. Pennsylvania.

Jan. 24, 2003.

---

Robert B. Hoffman, Reed Smith LLP, Harrisburg, PA, Paul M. Smith, Thomas J. Perrelli, Bruce V. Spiva, Daniel P. Mach, Brian P. Hauck, Jenner & Block, L.L.C., Washington, DC, for Richard Vieth, Norma Jean Vieth.

J. Bart DeLone, office of Atty. Gen., Harrisburg, PA, for Commonwealth of Penn., Mark S. Schweiker, Kim Pizzingrilli, Richard Filling, Weaver.

John P. Krill, Jr., Linda J. Shorey, Jason E. Oyler, Julia M. Glencer Kirkpatrick and Lockhart, LLP, Harrisburg, PA, for Robert C. Jubelirer, Matthew J. Ryan, Republican Caucus of Pennsylvania House of Representatives.

Tom Lingenfelter, Doylestown, PA, pro se.

Lawrence J. Moran, Edwin A. Abrahamsen, James Joseph O'Connor Abrahamsen, Moran & Conaboy, P.C., Scranton, PA, Mark A. Packman, Lara H. Schwartz, Aaron R. Lancaster, Filomena D'Elia, Gilbert Heintz & Randolph LLP, Washington, DC, for Senator Robert J. Mellow.

Paul M. Smith, Thomas J. Perrelli, Bruce V. Spiva, Daniel P. Mach, Brian P. Hauck, Jenner & Block, L.L.C., Washington, DC, for Susan Furey.

Deborah R. Willig, Willig, Williams & Davidson, Philadelphia, PA, Christopher B. Craig, Harisburg, PA, Mark A. Aronchik, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Casey for Governor Committee, Rendell for Governor Committee, Pennsylvania Democratic Party.

## OPINION AND ORDER
## OF THE COURT

PER CURIAM.

Before the court are Plaintiffs' motion to impose remedial districts and Defendants' motion for summary judgment. The parties have briefed the issue, as has *amicus curiae*. Additionally, the parties have presented oral argument on the instant motion. Accordingly, the matter is ripe for disposition.

### I. *Background*

This case involves an ongoing challenge to Pennsylvania's congressional redistricting effort. The Commonwealth initiated the redistricting process in response to the year 2000 decennial census which indicated that Pennsylvania would lose two seats in Congress due to shifts in the national population. Accordingly, the Commonwealth enacted its initial redistricting plan. That plan has been referred to throughout this litigation as Act 1.

Shortly thereafter, Plaintiffs initiated the instant suit seeking to have Act 1 declared unconstitutional, based on the following constitutional doctrines: (1) as an unconstitutional gerrymander in violation of the Fourteenth Amendment to the United States Constitution; (2) as a violation of the principal of the one person-one vote doctrine as that doctrine is embodied in Article I and the Fourteenth Amendment Equal Protection Clause; (3) as a violation of the Privileges and Immunities Clause of the Fourteenth Amendment; and (4) as a violation of Plaintiffs' right to political association pursuant to the First Amendment. In accordance with the requirements of 28 U.S.C. § 2284, Chief Judge Edward Becker of the United States Court of Appeals for the Third Circuit appointed the present three judge panel to hear the challenge.

By an order dated February 22, 2002, the court dismissed all of Plaintiffs' claims, save for the one person-one vote claim. *See Vieth v. Pennsylvania*, 188 F.Supp.2d 532 (M.D.Pa.2002) [hereinafter *"Vieth I"*]. On March 11 and 12, 2002, the court held an evidentiary hearing on that claim. On April 8, 2002, the court issued an opinion and order in which a majority of the court held that Act 1 violated the dictates of one person-one vote and enjoined its implementation. *See Vieth v. Pennsylvania*, 195 F.Supp.2d 672, 679 (M.D.Pa.2002) [hereinafter *"Vieth II"*]. Additionally, the court granted the Pennsylvania General Assembly three weeks to submit a plan that would remedy the constitutional deficiencies in Act 1. *Id.*

Accordingly, on April 17, 2002, the General Assembly enacted a revised congressional redistricting plan. The next day, Governor Schweiker signed into law the new plan, Act 34. That bill repealed Act 1 and replaced it with Act 34's boundaries. Defendants then petitioned the court to stay its decision regarding Act 1 and to allow the 2002 congressional elections to proceed under Act 1's boundaries. Because primary elections were set to be held on May 21, 2002, the court agreed to stay its decision regarding Act 1 in order to allow the primary election to take place as scheduled. Therefore, Act 34 was not in operation for the congressional elections that took place in November of 2002. However, Act 34 is scheduled to govern the next round of congressional elections in November of 2004.

Ostensibly, Act 34 is a zero-deviation congressional redistricting plan. That is, the district-to-district populations vary by only one person, the minimum variation given that Pennsylvania's population does not divide into nineteen even districts. On April 22, 2002, Plaintiffs filed a motion for the court to impose remedial districts or, in the alternative, to begin remedial hearings. Through information presented in that motion, the court learned for the first time of a decision by the Court of Common Pleas for Armstrong County, Pennsylvania. That decision was issued on March 15, 2002—after enactment of Act 1, but before Act 34's enactment. The decision effectively altered the boundary between two voter precincts in Armstrong County—South Buffalo District Western and South Buffalo District Eastern. Those two precincts also represented the line dividing the 3rd and 12th Congressional Districts under both Act 1 and Act 34. The alteration had the effect of moving forty-nine people from the 12th Congressional District to the 3rd Congressional District. Apparently, this would have resulted in Act 34 having a deviation of ninety-seven between its most and least populated districts. This number would have represented a deviation over fives times greater than that in Act 1. On May 16, 2002, the Commonwealth enacted another statute, Act 44, seeking to retroactively rescind the Armstrong County Court's ability to alter voter precinct boundaries.

The Board of Elections for Armstrong County then petitioned the Armstrong County Court of Common Pleas to vacate its decision altering the voter precinct boundary. By an order dated July 29, 2002, the Armstrong County Court of Common Pleas denied the motion to vacate

its decision. Eventually, this court scheduled a hearing for January 9, 2003 for the parties to present oral argument regarding whether Act 34 remedied the constitutional defect that the court found rendered Act 1 infirm.

In the interim, Governor Schweiker signed Act 150 into law on December 9, 2002. That statute amended § 506 of the Pennsylvania Election Code to add the following statement:

> In administering elections for the nomination and election of candidates for the United States House of Representatives and the General Assembly, county boards of election shall adhere to the following rule: Where an election district is used in or pursuant to a congressional redistricting statute or the final plan of the Legislative Reapportionment Commission to define the boundary of a congressional district or state legislative district, the boundary of such election shall be the boundary existing and recognized by the Legislative Reapportionment Commission for the adoption of its final plan. The boundaries of the Congressional districts, as established by statute, and state legislative districts as set forth in the final plan of the Legislative Reapportionment Commission shall remain in full force and effect for use thereafter until the next reapportionment or redistricting as required by law and shall not be deemed to be affected by any action taken pursuant to this title.

Therefore, Act 150 had the apparent effect of negating the alteration of the boundary dividing the 3rd and 12th Congressional Districts.[1] Defendants subse-

---

**1.** Plaintiffs conceded at oral argument—and in their brief—that Act 150, if validly enacted, eliminated any one person-one vote issue with reference to Act 34. (*See* Pls. Br. in Opp.

Defs. Mot. for Sum. J. at 9 ("Act 150, if it were validly enacted and interpreted as Defendants suggest, would eliminate any one-

quently filed a motion for summary judgment on December 20, 2002. On December 30, 2002, the court issued an order indicating that the parties should be prepared to present oral argument on this motion at the January 9 hearing and that Plaintiffs should file their brief in opposition to summary judgment before the date of the hearing. On January 7, 2002, Plaintiffs filed their response to Defendants' summary judgment motion. On January 9, 2002, the court held its hearing.

The court's order of April 8, 2002 gave Defendants a period of time to "enact and submit for review and final approval by this Court, a congressional redistricting plan in conformity with this opinion." *See Vieth II*, 195 F.Supp.2d at 679. In response, the Commonwealth enacted Act 34. In accordance with the matters discussed at the January 9 hearing, the court finds that Act 34 sufficiently remedies the constitutional deficiencies of Act 1. Our hearing, was basically a review of Act 34 and we are now giving final approval to it. For the reasons stated below, the court finds that Act 34 does not violate any constitutional doctrine. The court, therefore, will deny Plaintiffs' motion to impose remedial districts. This decision renders Defendants' motion for summary judgment moot. The court, therefore, will not address that motion.

## II.  *Analysis*

### A.  **Population Deviation**

██ Article I, § 2 of the United States Constitution requires that members of Congress be chosen with equal representation for equal number of people. *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). This constitutional mandate, commonly referred to as

person, one-vote concerns raised by Act

the one person-one vote principle, requires "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* As the Supreme Court has explained:

> [T]he "nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. . . . Unless population variances among congressional districts are shown to have resulted, despite such effort, the State must justify each variance, no matter how small. . . . [Article I, § 2, therefore] permits only the limited population variances *"which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown."*

*Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (emphasis added).

Thus, in a challenge to a congressional redistricting plan, the plaintiff bears the initial burden of proving: (1) that a deviation exits in district-to-district population which could have been reduced; and (2) the deviation is not a result of a good faith effort to achieve exact equality in district-to-district population. *See Karcher v. Daggett*, 462 U.S. 725, 730, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (holding that the plaintiff's initial burden is to prove that the differences in district-to-district population could have been reduced or eliminated by "a good-faith effort to draw districts of equal population"). If the plaintiffs can meet its burden, then the State must prove that some legitimate reason justifies the variances. *See id.* at 731, 103 S.Ct. 2653.

As to Act 1, the court unanimously found that Plaintiffs satisfied their initial burden. *See Vieth II*, 195 F.Supp.2d at 676, 679. Crucial to this holding was the testimony of Dr. John Memmi, the Re-

34.").)

publican House Caucus's congressional redistricting map-maker. Dr. Memmi testified that the Republican House leaders instructed him to stop shifting populations between districts once the process yielded a map with a nineteen person deviation. Although the court noted that such a deviation is minuscule given that Pennsylvania's census population totaled 12,281,054, it also noted that *"Karcher* specifically holds that 'there are no *de minimis* variations which could practically be avoided, but nonetheless meet the standard of Art. I, § 2 without justification.'" *Id.* at 676 (quoting *Karcher,* 462 U.S. at 734, 103 S.Ct. 2653). Because the population deviation in Act 1 was not the result of a good faith effort to achieve precise mathematical equality in district-to-district populations, the court held that Plaintiffs satisfied their initial burden under the Karcher/*Kirkpatrick* framework. *Id.*

Therefore, the burden switched to Defendants to justify the minuscule deviation in Act 1. A majority of the court held that Defendants failed to proffer any legitimate justification for the deviation. *Id.* at 678. The dissenting member of the court, however, found that Defendants justified the deviation by demonstrating that making Act 1 a zero deviation map would entail splitting twenty additional voter precinct districts; thus resulting in additional administrative costs and voter confusion. *Id.* at 680 (Yohn, J. dissenting in part).[2]

As to Act 34, the court finds that Plaintiffs have failed to satisfy their burden. First, Plaintiffs have failed to demonstrate that the variations in district-to-district population could have been reduced. Act 34 is a zero-deviation plan. They also argue that the Armstrong County Court's decision results in Act 34 having a ninety-seven person deviation. In response, Defendants contend that Act 150 effectively nullifies that change, forcing county boards of elections to use the same boundaries that were established by the Legislative Reapportionment Commission prior to the enactment of both Act 1 and Act 34. We do not need to decide this issue because even if Act 150 could not undo the Armstrong County Court's alteration, the court finds that Act 34, Act 44, and Act 150 represent "a good faith effort to draw districts of equal population." *Karcher,* 462 U.S. at 730, 103 S.Ct. 2653.

The court is convinced that the General Assembly passed Act 34 expecting that it would be a zero-deviation map. This is evidenced by the fact that since the Armstrong County Court's decision, the General Assembly has twice, through enactment of Acts 44 and 150, sought to undo the alteration brought about by that decision. These three statutes, when read together, evidence a good-faith effort to draw districts of equal population, even if Acts 44 and 150 are later declared invalid as violations of the Pennsylvania Constitution as Plaintiffs argue they should be.[3] As to Act

2. The majority, in contrast, noted evidence indicating that it was possible to draw a zero deviation map that split no voter precincts. *See id.* at 677 (noting that "it is possible to draw a congressional district map with zero deviation and no precinct splits").

3. The court notes that Act 34 represents a good faith effort to achieve zero deviation, but like its predecessor, Act 1, jettisons every other neutral non-discriminatory redistricting criteria that the Supreme Court has endorsed in one person-one vote cases. *See Karcher,*

462 U.S. at 753–59, 103 S.Ct. 2653 (Stevens, J. concurring) (holding that compliance with neutral criteria demonstrates that the legislature's intention is designed to further non-discriminatory policies); *see also Vieth II,* 195 F.Supp.2d at 678 ("[I]t is clear that *Karcher'* s neutral criteria were not high on the priority list in enacting Act 1.") Despite an opportunity to improve upon the numerous deficiencies of Act 1, Defendants have returned to this court with essentially the same map. However, this map does not possess the same popu-

34, unlike Act 1, there is no evidence indicating that the General Assembly intended that there be a deviation or that it considered the slight deviation a non-issue. *See Vieth II,* 195 F.Supp.2d at 676 (discussing Dr. Memmi's testimony and concluding that "Defendants did not put forth a good-faith effort to draw districts of equal population"). Likewise, there is no evidence in the record indicating that members of the General Assembly, when passing Act 34, relied on anything other than the population data prepared from the census tracts compiled by the bi-partisan Legislative Data Processing Center in considering the population of election precincts and congressional districts. Moreover, there is no evidence in the record which suggests that members of the legislature were even aware of the change in the election districts in South Buffalo Township when they voted to pass Act 34 on April 17, 2002. There is simply no evidence in the record indicating that the General Assembly intended to enact anything other than a zero-deviation congressional redistricting plan. The court, therefore, finds that Act 34 represents a good faith effort to achieve precise mathematical equality in congressional district-to-district population. Accordingly, Plaintiffs have failed to satisfy their burden.

Because the court finds that Plaintiffs have failed to satisfy their initial burden under the *Karcher* test, no inquiry regarding justification is needed for there is nothing to justify. Act 34 complies with the dictates of the one person-one vote doctrine.

### B. Plaintiffs' Challenge to Act 150 based on Pennsylvania Constitutional Law

■ Plaintiffs challenge the validity of Act 150 on the basis that it violates a litany of Pennsylvania Constitutional doctrines. However, because the court has already held that Acts 34, 44 and 150, when read in conjunction, evidence a good-faith effort to achieve population equality, the validity of these statutes is immaterial. *See Kirkpatrick,* 394 U.S. at 530–31, 89 S.Ct. 1225 ("[T]he 'nearly as practicable' standard requires that the State make a good-faith effort to achieve mathematical equality. *Unless population variances among congressional districts are shown to have resulted despite such effort,* the State must justify each variance, no matter how small." (emphasis added)).

The court, therefore, need not decide these issues of Pennsylvania law because even if they were resolved in Plaintiffs' favor, the court finds that the three statutes at issue—Acts 34, 44, and 150—at the very least represent a good-faith effort to achieve equal district-to-district population. Even if Acts 44 and 150 were to be declared invalid, this would have no effect on the claim that Act 34 violates the one person-one vote doctrine.

### C. Partisan Gerrymandering

■ Plaintiffs also seek to preserve their argument that Act 34 is a partisan gerrymandering and, thus, violates the Equal Protection Clause of the Fourteenth Amendment. As discussed earlier, Plaintiffs presented the same argument with respect to Act 1. In *Vieth I,* the court dismissed this claim because "Plaintiffs [did not] allege facts indicating that they have been shut out of the political process and, therefore, they cannot establish an actual discriminatory effect on them," as required by *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

---

lation deviations as Act 1. Therefore, Plaintiffs have failed to meet their initial burden under *Karcher,* and the court has no opportunity to address these criteria as they relate to Act 34.

*Vieth I,* 188 F.Supp.2d 532, 547 (M.D.Pa. 2002). Act 34 is essentially the same redistricting plan as Act 1, except for the fact that Act 34 does not possess an avoidable population deviation. Accordingly, whatever partisan effect Act 1 had, Act 34 will have as well. The court, therefore, incorporates by reference its discussion in *Vieth I* regarding partisan gerrymandering and holds that the undisputed facts in this case are insufficient to establish such a claim. *See id.* at 543–47.

## IV. *Conclusion*

Act 34 does not violate the principal of one person-one vote. Therefore, Act 34 remedies Act 1's constitutional defect. Additionally, Act 34 is not a partisan gerrymandering, at least as far as that term is defined by the Supreme Court in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Therefore, the court will deny Plaintiff's motion to impose remedial districts. Because the court has decided that Act 34 cures the constitutional defect found by the court in its memorandum and order of April 8, 2002, Defendants' motion for summary judgment is moot. An appropriate order will issue.

### *ORDER*

In accordance with the attached opinion of the court, **IT IS HEREBY ORDERED THAT:**

(1) Plaintiffs' motion to impose remedial district is **DENIED.** Act 34 does not violate the United States Constitution;

(2) Defendants' motion for summary judgment is **DENIED AS MOOT;** and

(3) In conformity with court's order of April 8, 2002, the Congressional Redistricting Plan contained in Act 34 is given final approval. The Clerk of Court is direct to enter judgment in favor of Defendants and against Plaintiffs.